IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 15-cr-00067-WJM

UNITED STATES OF AMERICA,

        Plaintiff,

v.

**THADDEUS CHEYENNE MURPHY,**

        **Defendant.**
_____

## SENTENCING STATEMENT
_____

      MR. THADDEUS CHEYENNE MURPHY (hereinafter Mr. Murphy), by and through undersigned counsel, submits the following Sentencing Statement. Mr. Murphy respectfully requests the Court to impose a sentence of sixty (60) months of imprisonment.

## SUMMARY OF ARGUMENT

      The requested sentence of 60 months imprisonment is within the advisory United States Sentencing Commission (USSC) guideline range. The requested sentence also is recommended by the Probation Department (Doc. 28) and the government.

      Thaddeus Murphy is a husband, a father to two girls, and a talented carpenter. He is a valued member of his family and a friend to many in and around the Colorado Springs area.

      In January of 2015, Mr. Murphy suffered from insomnia, anxiety, and depression. His family's financial situation was poor and he planned to file for bankruptcy but could not locate his former his accountant to obtain his prior tax returns. He was taking

significant doses of sleeping medications and pain relievers which resulted in his failure to think clearly. Under these unique set of circumstances, Mr. Murphy made a horrible mistake: he set an explosive device near a building he thought belonged to his former tax accountant in order to scare him.  He later was discovered to be in possession of several weapons inside of his home.  His crimes are serious ones, but no one was injured by his actions and no real damage was done to the building where the explosion occurred.

I.      18 U.S.C. §3553(a)(1)

   A) Nature of the Offenses

Mr. Murphy committed the offenses of arson, in violation of 18 U.S.C. §844(I), and possession of a firearm as a previously convicted felon in violation of 18 U.S.C. §922(g).  He plead guilty to both counts on August 3, 2015.

      I) Arson - January 6, 2015

On January 6, 2015, Mr. Murphy drove to 603 S. El Paso Street in Colorado Springs, Colorado, and caused a small pipe bomb to explode by putting a small amount of gun powder inside of an empty pipe and lighting it on fire with a fuse.  By the way the bomb was made, the explosion created a very loud noise but did no structural damage to the building.  *See* Attachment A - Photos of the Site.  In fact, the wall of the building adjacent to where the bomb was set had only some minor charring.  *See* Attachment B - Close-up Photo of the Site.  Mr. Murphy inexplicably left a container of gasoline at the scene, more than five feet away and above from where the bomb exploded.  *See* Attachment A.

The blast occurred on the northeast corner of the building located at 603 South El Paso Street in Colorado Springs, Colorado. On the north side outer wall hung an "Income Tax" sign. A hair salon was located on the same side of the building. The office for the National Association for the Advancement of Colored People (NAACP) was located on the opposite side of the building. No one from either business was injured.

ii) Illegal Possession of Firearms - February 19, 2015

On February 19, 2015, federal agents entered Mr. Murphy's home with a search warrant. The agents spoke to Mr. Murphy for nearly three hours. After initially denying his involvement in the incident at 603 S. El Paso St., Mr. Murphy began to cry. He admitted to setting the bomb near the building. He told them that he was under a lot of stress from his work and that he did it to scare his old tax accountant, whom he believed to have an office at that location and was not returning his phone calls. During the interview, Mr. Murphy repeatedly stated that he did not have an intent to hurt anyone.

At that time, agents searched Mr. Murphy's home and adjacent garage and recovered multiple weapons. The majority of the weapons were recovered inside of Mr. Murphy's garage in a locked gun safe. *See* Doc. 28 at ¶17 and Attachment C - Photo of Gun Safe. Mr. Murphy and his wife maintained the combination to the gun safe.

Having and shooting firearms has been a hobby of the entire Murphy family. Mr. Murphy was exposed to firearms at an early age as his father was a law enforcement officer. Mr. Murphy learned from his father that it was important to store weapons safely in order to avoid injury. Mr. Murphy has never hurt anyone with a weapon. Mr.

3

Murphy's two daughters also were exposed to firearms growing up and they have been taught how to use and store weapons safely.

The Probation Department correctly observed that based on the statutory definition of the term "firearms," the total number of firearms found inside of the Murphy household was 11. *See* Doc. 28 at ¶20 (referencing 18 U.S.C. 921 (a)(3)(B)). It is important to note, though, that included in that number were several receivers (firearm frames) that are firearms by definition even though they are not able to fire a projectile. *See* Attachment D - photo of receiver. Also included in the calculation was a silencer that was not attached to any particular weapon and was not threaded to fit any of the weapons found.

B) History and Characteristics of the Defendant

i) Family

Mr. Murphy was born in Boulder, Colorado, in 1970, making him 45 years old at the time of the Sentencing Hearing. His parents were married when he was born but they divorced soon after his birth. Mr. Murphy was primarily raised by his mother although his father maintained contact with him growing up.

Mr. Murphy's mother worked long hours when Mr. Murphy was a child in order to support the family. As a result, much of the responsibility for raising Mr. Murphy and his younger sister fell on his older sister, Meredith. Mr. Murphy was not taught many of the life skills that children typically learn from their parents. He was forced to make decisions for himself at an early age.

Mr. Murphy has been married to his wife, Donna, since 1994. She remains in his corner supporting him because he is her "best friend and soul mate." *See* Attachment E - Letter from Donna Murphy. He has many strong character traits that she has observed in their 20+ years of marriage: generosity, dedication and devotion being a few. Mr. Murphy has provided for their family for more than two decades.

Mr. and Mrs. Murphy have two daughters, aged 23 and 17. As much as Mr. Murphy worked, he also played a large role in the upbringing of the children. He helped them with their homework and taught them how to drive a car. As evidenced by the letter of support, Mr. Murphy's daughters love their father very much and describe him as "the most important person in [their] life." *See* Attachment F - Letter from Cheyenne and Tia Murphy. The extended separation from his daughters will be extremely difficult for Mr. Murphy.

Mr. Murphy's mother and sister, individuals that have known him longer than anyone else, are shocked by Mr. Murphy's actions in this case because the offense is so out of character for him. *See* Attachments G & H - Letters from Lucy Vail and Krista Murphy. They both remain supportive and have observed Mr. Murphy to be remorseful and ashamed of what he did.

ii) Work

For nearly three decades, Mr. Murphy has worked in the field of carpentry and general construction. He is known for his creative vision as well as for his work ethic. His work has taken him on jobs all over the state of Colorado.

One of Mr. Murphy's specialties was in the construction of display counters and gun benches for sporting good stores. Mr. Murphy designed and constructed multiple

display counters for various businesses in Colorado. *See* Attachment I - Photos of Display Counter. He also designed and constructed gun benches for cleaning weapons that were for sale in sporting goods stores. *See* Attachment J - Photos of Gun Bench. Mr. Murphy takes great pride in his work and from the photos one can see why.

    iii) Substance Abuse/Mental Health

For some time now, Mr. Murphy has suffered from anxiety and depression. Mental illness is present in his family as well. *See* Doc. 28 at ¶60 and Attachment G. For the most part, Mr. Murphy hid his symptoms by throwing himself into his work. In the latter part of 2013, however, as his work responsibilities grew and financial concerns became worse, Mr. Murphy became more stressed. Bankruptcy was imminent. His inability to locate his tax returns from his former accountant prevented the bankruptcy from proceeding. His anxiety increased.

Mr. Murphy has had sleep problems for some time as well. With the added financial stress, the inability to sleep caused him to increase the amount of sleeping pills he took nightly.[1] His back and knee pain from three decades of hard labor also required him to take more and more prescription medications. As time went on, increasing amounts of both sleeping pills and pain medication were required for him to function. By the time of this incident, Mr. Murphy's consumption of sleeping pills and pain medication was well above the recommended dosages.

---

[1] In early 2013, the Food and Drug Administration recommended lowering the dosage of sleeping medications like Ambien due to a demonstrated impairment in the morning following consumption. *See* http://www.fda.gov/Drugs/DrugSafety/ucm334033.htm (Last visited on October 19, 2015).

6

About a month after the bomb was set at 603 El Paso Street and ten days before Mr. Murphy was arrested, on February 9, 2015, his wife called 911 at four o'clock in the morning because she believed that her husband had overdosed on sleeping medication. The police arrived to find Mr. Murphy groggy and confused. He was not taken to the hospital, and the police left his home recommending that he contact his doctor to discuss the side effects of his medication.

iv) Criminal History

Mr. Murphy pled guilty and was convicted of two felony theft cases in 2009. Each of the cases involved similar allegations: Mr. Murphy was paid to do work that was not done at all or was started and not completed.

One half of his criminal history score (3 points) is based on the second case, (07CR3529 - Doc. 28 at ¶53), where Mr. Murphy was paid to do a job that was not completed over a period of about three weeks. Mr. Murphy was arrested two months later and did not complete the remainder of the work. Instead of adding counts to the existing Indictment, the State decided to add a new case against Mr. Murphy. He pled guilty to both cases and the sentences were ordered to run concurrent. Because the two cases were charged separately, both sentences receive criminal history points according to the guidelines.

Other than a few minor traffic violations, Mr. Murphy has no other criminal convictions in the past twenty years. The 2009 theft convictions and the present case stand out as anomalies in an otherwise productive life.

v) Age/Recidivism

On the date of sentencing Mr. Murphy will be three days shy of his 46th birthday.

At the time of his release from the sentence requested in this filing, Mr. Murphy likely will be more than 50 years old. Recidivism rates decline substantially as age increases. According to the USSC's Recidivism Study conducted 2003, based on Mr. Murphy's age at sentencing (45) and his criminal history category (III), the likelihood of recidivism is under 25%.  *See*

http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf (last visited October 19, 2015).  The recidivism rate for individuals of Mr. Murphy's age is less than half the risk of a 21 year old with the same criminal history.[2]  *See id.*

## II. A SENTENCE OF 60 MONTHS IMPRISONMENT WOULD BEST SATISFY THE GOALS OF §3553(a).

The Court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)," which are "the need for the sentence imposed -

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> B) to afford deterrence to criminal conduct;
> C) to protect the public from future crimes of the defendant; and
> D) to provide the defendant with needed educational, or vocational training, medical care, or other correctional treatment in the most effective manner.
> 18 U.S.C. §3553(a)(2).

### A) A Sentence of 60 Months In Prison Will Punish Mr. Murphy Sufficiently and Reflect the Seriousness of the Offense

Of his prior five year sentence in 2009, Mr. Murphy served approximately 10 months of imprisonment before he was released to a state-run community corrections

---

[2]According to the USSC Study, violations of Supervised Release and re-arrests were included in addition to subsequent convictions.

facility, where he spent an additional 11 months.  Mr. Murphy then was released on parole in November of 2010 and began a period of intensive probation lasting six months.  During all of those periods of release and probation, Mr. Murphy did not commit any violations.  As a result, the state court sentence was discharged in January of 2013.

The present sentence will require four to five times more imprisonment than what he served on his 2009 sentence.  "It is appropriate for a court, when considering the type of sentence necessary to protect the public and deter future misconduct, to note the length of any previous sentences imposed."  *United States v. Qualls*, 373 F. Supp. 2d 873 (E.D. Wis. 2005).  Sixty months in prison will be sufficient and will reflect the seriousness of the offenses that Mr. Murphy committed.

> B and C)    The Need to Protect the Public from Mr. Murphy and the
>             Need to Deter Will Be Satisfied with a 60 Month Sentence

Contrary to popular belief, longer sentences do not equate with added deterrence.  In fact, research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."  Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime & Just. 1, 28 (2006).  "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of evidence."  *Id.* (see also Zvi Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime,* 8 Cardozo J. Conflict Resol. 421, 447-48 (2007)("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.")

As described above, Mr. Murphy's age predicts a lower risk that he will commit another crime or violate the terms of his Supervised Release following his release from imprisonment in the present case. His possession of weapons, while a serious crime, for the most part was restricted to the possession of such weapons inside of a locked gun safe in his family's garage.

Furthermore, any concerns that the Court may have about the requested sentence failing to punish Mr. Murphy for his conduct can be addressed by the imposition of a term of Supervised Release. During that time, the Probation Department can supervise Mr. Murphy's reintegration into society. Any violation of those conditions imposed by the Court will result in Mr. Murphy being brought back before the Court and subjected to further imprisonment. It is Supervised Release that will achieve the result of deterrence and protection of the public, not an increased sentence of incarceration.

D.      <u>Treatment is Necessary for Mr. Murphy, Not Extended Incarceration</u>.

Near the time of the occurrence of the present case, Mr. Murphy was abusing prescription pain medication and sleeping pills. Ten days prior to his arrest, he nearly overdosed, causing his wife to call the police at four o'clock in the morning.

If there is a provision of his sentence that could potentially minimize Mr. Murphy's potential to re-offend and could protect the public, it would be a requirement that he participate in substance abuse and mental health treatment. He needs to learn the skills necessary to avoid the triggers that cause him to abuse substances. He also needs to learn how to deal with stress in healthy ways.

Increasing the sentences of imprisonment simply does not rehabilitate. It only

punishes:

> [W]hile prison building and prison spending continue to increase, public safety is not improving.  Since 2003, spending on incarceration has continued to rise, but crime rates have flattened.  Indeed crime rates appear to have reached a plateau, and no longer respond to increases in incarceration.  See Remarks as prepared for delivery by Attorney General Eric Holder at the Vera Institute of Justice's Third Annual Justice Address (event held July 9, 2009).  Available at http://www.vera.org/sites/default/files/eric-holder-justice-address-transcript.pdf (last visited October 19, 2015).

Through a combination of imprisonment and Supervised Release (to include an order to participate in substance abuse and mental health treatment), the sentencing goals as stated in 18 U.S.C. §3553(a) can be accomplished in the present case.

## III.     THE REQUESTED SENTENCE IS A GUIDELINE SENTENCE

The requested sentence, agreed upon by the parties and the Probation Department, constitutes a guideline sentence according to the 2014 USSC Guideline Manual.  The guideline calculation contemplates a total offense level of 23 and a Criminal History category III.  The guideline range would normally be 57-71 months, but considering the mandatory minimum of 60 months for the offense of arson, the guideline range becomes 60-71 months.  *See* USSC guideline §5G1.1.  As a result, the requested sentence of time served will be within the advisory guideline range and will not result in an unwarranted sentencing disparity.

The low end of the guideline range is appropriate because the applicable guidelines contain two seemingly arbitrary enhancements.  First, Guideline §2K2.1(a)(4) sets the same base offense level (20) when the offense involved a semiautomatic firearm that is capable of accepting a large capacity magazine as when the individual committing the offense had committed a prior felony crime of violence or drug trafficking

offense.  To equate the two situations seems to be excessive.  Second, Guideline §2K2.1(b)(1)(B) enhances Mr. Murphy's offense level by four due to the number of firearms possessed.  Arbitrarily, the possession of 11 weapons (including three receivers and one silencer, most of which were in a locked gun safe) is two offense levels more serious than the possession of seven weapons, and is four levels more serious than the possession of two weapons.  If these advisory guideline enhancements are not followed and/or the criminal history category is adjusted due to the above-noted charging decision by the state from Mr. Murphy's 2009 case, the applicable guideline range falls below the statutory mandatory minimum of 60 months that applies in the present case.

In the end, though the guideline range includes the mandatory minimum sentence and the parties agree that such a sentence would be sufficient, but not greater than necessary.

**IV.     CONCLUSION**

Mr. Murphy has admitted guilt and agrees that he should be punished for his conduct.  A sentence of sixty (60) months in prison would be a sentence "sufficient, but not greater than necessary" to achieve all of the goals as set forth in 18 U.S.C. §3553(a).

                                                Respectfully submitted,

                                                VIRGINIA L. GRADY
                                                Federal Public Defender


                                                s/ Timothy P. O'Hara
                                                TIMOTHY P. O'HARA
                                                Assistant Federal Public Defender
                                                633 17th Street, Suite 1000
                                                Denver, CO  80202
                                                Telephone:  (303) 294-7002
                                                FAX:  (303) 294-1192
                                                Timothy_OHara@fd.org
                                                Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on October 20, 2015, I electronically filed the foregoing **SENTENCING STATEMENT** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

    Greg Holloway
    Assistant United States Attorney
    email: Greg.Holloway@usdoj.gov

and I hereby certify that I have emailed, mailed and/or served the document or paper to the following non CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

    Michelle D. Means
    U.S. Probation Officer
    Email: michelle.means@cod.uscourts.gov


    Thaddeus C. Murphy  (via U.S. Mail)



                            s/ Timothy P. O'Hara
                            TIMOTHY P. O'HARA
                            Assistant Federal Public Defender
                            633 17th Street, Suite 1000
                            Denver, CO  80202
                            Telephone:  (303) 294-7002
                            FAX:  (303) 294-1192
                            Timothy_OHara@fd.org
                            Attorney for Defendant